STATE OF MISSOURI at the Information of M. J. HUFFMAN, Prosecuting Attorney of Wright County, Missouri, ex officio, and at the Information of M. J. HUFFMAN, Prosecuting Attorney of Wright County, Missouri, at the Relation of W. D. FREEMAN and C. H. CRAMER, Informant, v. SHO-ME POWER COOPERATIVE, a Corporation, Respondent, ARKANSAS-MISSOURI POWER CORPORATION, EMPIRE DISTRICT ELECTRIC COMPANY and MISSOURI UTILITIES COMPANY, Intervenors.—No. 38883.—191 S. W. (2d) 972.

Court en Banc, January 14, 1946.

---

[5]Dorsey v. Gill, 148 Fed. (2d) 857, 876(4, 9); Diggs v. Welch, 148 Fed. (2d) 667, 668-9(2-4); Tompsett v. State, 146 Fed. (2d) 95, 98(2).

*F. R. Collier,* Prosecuting Attorney of Wright County, for informants.

*R. B. Oliver, Jr., R. K. McPherson, Ludwick Graves, Roscoe P. Conkling* and *A. Z. Patterson* for intervenors.

*Henry C. Salveter, Gregory C. Stockard, Wilbur L. Morse* and *Virginia Morsey* for respondent.

*Gregory C. Stockard, amicus curiae.*

LEEDY, J.—This is an original proceeding by information in the nature of quo warranto, instituted by the Prosecuting Attorney of Wright County, in his official capacity, and at the relation of two resident taxpayers of that county, against respondent, Sho-Me Power Cooperative, a corporation (hereinafter referred to as Sho-Me), wherein certain public utility companies have been permitted to become intervenors.

Hon. Arthur N. Adams, Jr., of the Kansas City Bar, who was appointed Special Commissioner to hear the evidence and report his findings of fact and conclusions of law, filed an exhaustive report in which it was recommended that judgment of ouster be awarded, the same to be conditioned, however, so as to afford respondent a reasonable opportunity to effectuate reorganization. The facts as found by him are not challenged, and we adopt the same, and set forth the following portions thereof (quotation marks omitted):

The Missouri Electric Power Company (called M. E. P.) was a public utility corporation organized and existing under the laws of Missouri. It owned and operated electric generating and distribution plants and transmission lines in 18 Missouri counties, with substations and other properties used in the sale of electric current. It operated under the regulatory jurisdiction of the Missouri Public Service Commission. In addition to its electric utilities system, it owned and operated three ice plants located respectively at Puxico, Doniphan and Willow Springs, Missouri, and one water system at Puxico, Missouri.

The property formerly owned by M. E. P. and subsequently sold to and now being operated by Sho-Me are listed in detail in Exhibit

4. These properties consist generally of "7 generating plants, 3 ice plants, 1 water system, approximately 370 miles of 33 KV, 22 KV and 13. 8 K. V. transmission lines, 37 sub-stations, and 43 distribution systems, together with all lands, easements, rights-of-way and certain rights and interests in lands and governmental and other rights, franchises, ordinances, authorizations, privileges and consents, useful, held for use or acquired in connection with said plants, sub-stations, lines and systems."

Of this system, a substantial portion, of the value of approximately $150,000.00, is located in Wright county where the informant Huffman is prosecuting attorney and the other individual informants are citizens, taxpayers and consumers of electricity produced and sold by Sho-Me.

Prior to the sale hereinafter referred to, all issued and outstanding voting stock (except qualifying shares) and all of the securities of M. E. P. were owned by Central Power and Electric Corporation, a Delaware corporation. The Central Power and Electric Corporation was a subsidiary of the Central States Utilities Corporation, a Delaware corporation, which in turn was a subsidiary of Ogden Corporation, a Delaware corporation, whose capital stock is owned by Atlas Corporation.

Under a plan of reorganization, which was filed with the Securities and Exchange Commission, subsequently approved by the Commission and the United States District Court for the Eastern Division of the Northern District of Illinois, the details of which are not here material, an order was made requiring the parent company to divest itself of the control of M. E. P.

Sho-Me Power Cooperative, Inc. (called Sho-Me) is a Missouri corporation organized and incorporated by certificate issued by the Secretary of State of Missouri on October 23, 1941, under Chapter 102, Article 28, Revised Statutes of Missouri for 1939. It was originally organized and incorporated with an authorized capital stock of $3,000.00, being 600 shares of the par value of $5.00, and with the declared purpose of operating electric utility service to its shareholders. Its place of business was designated to be Columbia, Missouri.

Sho-Me was incorporated by 26 persons who were members, active officers, and representatives of 26 electric cooperatives organized and operating in Missouri under the Federal Rural Electrification Act of Congress. Five other cooperatives subsequently joined, and at the time of the hearing in this case these representatives of 31 electric cooperatives and one individual, the secretary, constituted the membership of Sho-Me. Each of these members subscribed ■■■ for one $5.00 share of stock and contributed $100.00 toward a development fund. Outside of these 32 shares no other shares of stock in Sho-Me have been issued.

Of the original incorporators of Sho-Me only four were operating in the general territory served by M. E. P. Two of those that subsequently became members of Sho-Me also operated in that territory.

The original intention of the incorporators of Sho-Me was to build generating plants if and when necessary. Afterwards when the M. E. P. purchase was proposed it was considered necessary and advisable to amend the articles of association.

On October 13, 1942, the articles of incorporation of Sho-Me were amended, as duly certified by the Secretary of State, to increase the capital stock to $75,000.00, composed of 15,000 shares of the par value of $5.00 each, and the purposes were enlarged to include electric service also for the public generally. According to the articles of association as amended, Sho-Me is authorized to transact business as follows:

"Third. The conduct of the business of the Cooperative shall be upon the cooperative plan and the purposes for which it is formed are:

"(a)    to generate, manufacture, purchase, acquire and accumulate electric energy for its shareholders and for the public generally, and to transmit, distribute, furnish, sell and dispose of such electric energy to its shareholders and to the public generally; and to construct, erect, purchase, lease as lessee and in any manner acquire, own, hold, maintain, operate, sell, dispose of, lease as lessor, exchange and mortgage plants, buildings, works, machinery, supplies, apparatus, equipment and electric transmission and distribution lines or systems necessary, convenient or useful for carrying out and accomplishing any or all of the foregoing purposes:

"(b)    to acquire, own, hold, use, exercise and, to the extent permitted by law, to sell, mortgage, pledge, hypothecate and in any manner dispose of franchises, rights, privileges, licenses, rights of way and easements necessary, useful or appropriate to accomplish any or all of the purposes of the Cooperative;

"(c)    to purchase, receive, lease as lessee, or in any other manner, acquire, own, hold, maintain, use, convey, sell, lease as lessor, exchange, mortgage, pledge or otherwise dispose of any and all real and personal property or any interest therein necessary, useful or appropriate to enable the Cooperative to accomplish any or all of its purposes;

"(d)    to borrow money, to make and issue bonds, notes and other evidences of indebtedness, secured or unsecured, for moneys borrowed or in payment for property acquired, or for any of the other objects or purposes of the Cooperative;

to secure the payment of such bonds, notes or other evidences of indebtedness by mortgage or mortgages, or deed or deeds of trust upon, or by the pledge of or other lien upon, any or all of the property, rights, privileges or permits of the Cooperative, wheresoever situated, acquired or to be. acquired; and

"(e)  to do and perform, any and all acts and things, and to have and exercise any and all powers, as may be necessary, or convenient to accomplish any or all of the foregoing purposes, or as may be permitted by the Act under which the Cooperative is formed."

After the above referred to order had been made requiring the parent company to divest itself of the control, securities and assets of the M. E. P. through the instrumentality of the Rural Electrification Administrator, Sho-Me was sought as a purchaser for said M. E. P. properties as a whole. A conference was held June 11th and 12th, 1942, between representatives of Central States Power and Light Corporation, the Missouri Electric Power Company, and the Rural Electrification Administration with respect to the sale of the M. E. P. properties, as a result of which a memorandum agreement was entered into, providing, among other things, "The sellers, acting through Mr. Sindebond, agree that they will cause all of the physical properties of the Missouri Electric Power Company to be sold to such R. E. A. financed cooperatives as the Administrator of the R. E. A. shall designate upon the following basis:" Then followed a statement, of the terms of the sale, including a provision for the execution of a formal contract. This memorandum was approved with some modifications, and subsequently, a final contract was entered into dated September 15, 1942.

In brief, the contract of sale was executed by Central States Power and Light Corporation and Missouri Electric Power Company as sellers, and by Sho-Me Power ▆▆▆ Cooperative, Inc., as buyer. It provided for a sale of all of the M. E. P. properties to Sho-Me at a base price of $2,350,000.00, with provisions of adjustments therein recited on the closing of the deal.

The contract of September 15th was subsequently modified twice so, as to extend the time provided therein for closing, and was modified finally by agreement dated April 24, 1943. This last named agreement fixed April 29, 1943, as the closing date, stating the closing should take place at the office of the Rural Electrification Administration at St. Louis, Missouri, or at such other place as the parties agreed. It further provided that the effectiveness of the agreement was expressly subject to the approval in writing by the administrator of the Rural Electrification Administration, or his duly designated representative.

On June 13, 1942, at the time of the execution of the memorandum agreement above referred to, the Rural Electrification Administrator

executed a loan agreement with Sho-Me Power Cooperative by which funds were to be provided to the Sho-Me Power Cooperative to be used in the purchase of the M. E. P. properties. This loan agreement, as executed, provided for a loan to Sho-Me of $4,275,000.00 in all, of which $2,504,000.00 is the purchase price of M. E. P. and $1,771,000.00 was to be a future loan to Sho-Me for the construction and operation of electric generating plant or plants and all other equipment necessary for the operation of said plants within some 45 named counties, including the counties of M. E. P. operations.

Among other provisions the loan agreement contained the following:

"The government shall lend and the borrower shall borrow an amount not in excess of $4,275,000.00 to finance, pursuant to the provisions of the act, the construction and operation of an electric generating plant or plants . . . for the purpose of furnishing electric energy to consumers in rural areas not receiving central station electric service . . ."

The agreement further provided for the execution of the note or notes in the full amount of the purchase price and for the execution of a mortgage or mortgages or deeds of trust at the administrator's election to secure payment of said notes.

By the terms of the loan agreement the Rural Electrification Administrator reserved extensive control over the actions and subsequent operations of Sho-Me Power Cooperative. It provided, among other things, that the note should be in the form satisfactory to the administrator; that the administrator might direct the application of revenues arising from the operation of the system to the payment of notes designated by the administrator; that the administrator might from time to time determine the amount required to enable the borrower to perform its obligations under the loan agreement; that the administrator should determine when no further funds were required to be advanced by the government to enable the borrower to perform its obligations; that the borrower should deliver the notes, mortgages and other instruments necessary to the closing of the transaction when directed by the administrator and subject to his approval; that the administrator should determine from time to time when advances should be made under the loan agreement; that the administrator might permit the borrower to construct the system by force contract; that the administrator should designate the reasonable time within which the system should be constructed and completed; that the administrator might require the borrower to invite bids for construction work, said bids to be opened in the presence of a representative of the administrator, the lowest bid to be accepted unless all bids were rejected by the administrator, or the administrator should approve the award of the contract to another bidder; that the administrator should supervise the construction and equipment of the system; that the administrator might reject any defective material or workmanship;

that the administrator might appoint a supervisor to look after the construction of the system if the construction was not proceeding according to contract; that in the event of the appointment of a supervisor the administrator, as agent constituted by the loan agreement, might direct any bank in which Sho-Me maintains its construction account with respect to signing or counter-signing checks, etc.

Many other controls over the details of the procurement of the system and its operation by Sho-Me were reserved by the administrator in this loan agreement, but those above enumerated serve to demonstrate the degree of control exercised by the administrator over the affairs of Sho-Me.

Subsequent to the execution of this loan agreement and subsequent to the amendment by Sho-Me of its articles of association an amendment to the loan agreement was entered into between the parties modifying the original loan agreement to provide for regulation of Sho-Me by the Missouri Public Service Commission, and conditioning performance under the loan agreement upon Missouri Public Service Commission approval.

At about the time these things were being consummated, the intervenors, Arkansas-Missouri Power Company and Missouri Utilities Company each respectively tried unsuccessfully to buy certain portions of the M. E. P. system, to-wit, the Doniphan group and the Puxico group.

On October 27, 1942, the Missouri Electric Power Company and the Sho-Me Power Cooperative filed a joint application with the Public Service Commission of Missouri for approval of the proposed sale of the M. E. P. properties to Sho-Me, approval of the terms and conditions of the sale, and approval of the execution of the note and mortgage provided for in the agreement.

Many electric utility companies asked for and were granted permission to intervene, and certain city and county authorities within the area affected by the operations of M. E. P. were likewise permitted to intervene and file pleadings. This proceeding before the Missouri Public Service Commission was designated Case No. 10,297. The complete application was introduced in evidence as Exhibit 4, and the report and order of the Commission after hearing was introduced as Exhibit 11.

Intervenors at the hearing before the Commission made the same challege to the corporate authority of Sho-Me to acquire the M. E. P. properties and to operate the same as a public electric utility business as they now make·in this proceeding.

After fully hearing the respective parties upon the application, the Missouri Public Service Commission entered an order approving the proposed sale of the M. E. P. properties to Sho-Me and approving the loan of money from the R. E. A. to Sho-Me and the execution by

Sho-Me of all necessary notes, deeds of trust and other instruments to consummate said sale and loan.

Concerning the contentions of intervenors respecting the corporate powers and corporate existence of Sho-Me, the Commission reached the following conclusion, after discussing the contentions of the respective parties:

"If, as we take it, intervenors mean that in our determination of whether the cooperative holds such *valid* and *lawful* charter powers to operate as a public utility, we must determine whether or not the charter powers which have actually been granted by the state are powers which are authorized by the statutes under which the corporation was incorporated, much as a court would do in a *quo warranto* suit, then we disagree with the intervenors. Such attacks in this case amount to a challenge of the corporate existence of 'Sho-Me', which can only be reached by the direct proceeding by *quo warranto* in the Courts, to halt the alleged and resulting usurpation of corporate power. Neither said Section 5649, or any other law to which we have been cited sustains the contrary view."

Thereafter, the purchase was consummated in accordance with the agreement and Sho-Me went into possession of the properties December 30, 1943, and has since that time been operating the property, fulfilling all franchises and lighting contracts of M. E. P., and otherwise operating as a public utility just the same as the M. E. P. did.

The respondent in all of the transactions referred to herein acted in good faith on the advice of not only its own counsel, but under opinions of the Attorney General of Missouri.

By adopting the foregoing, we have stated the facts at much greater length than necessary to determine the narrow issues to which the case has been reduced, under respondent's exceptions to the Special Commissioner's report and the briefs of the parties; but we think such detailed statement is desirable in presenting an over-all view of the situation, and indicates the thoroughness of the Special Commissioner's approach to the questions involved.

There is one basic issue in the case. It is stated in this language by respondent: "The parties may be said to have agreed that the principal issue is whether a cooperative, to engage in the electric business serving the general public, may incorporate under the Cooperative Companies ▇▇ Act," being Secs. 14406-14424, and comprising Art. 28, Chap. 102, R. S. '39, Mo. R. S. A., under which Sho-Me is organized. Article 28 is one of the twenty-nine which comprise Chap. 102 entitled "Agriculture." It similarly appeared in the 1929 revision as Art. 29, Chap. 87, "Agriculture." It was originally enacted in 1919. In the 1919 revision it was carried forward as part of Article 10, Chap. 90, under the heading "Private Corporations," and from this circumstance it seems to be argued by respondent that it was improperly placed in the 1939 and 1929 revisions under the

heading "Agriculture." We think the recitals of the emergency clause with which it was originally passed are conclusively in favor of propriety of the classifications of the 1929 and 1939 revisions. They follow: "This act being for the immediate preservation of agricultural products and the like, and being necessary for the immediate conservation of the welfare of the agricultural part of the state," an emergency is declared, etc. Laws 1919, p. 116. All references to statutes are to R. S. '39, and to the same section numbers in Mo. R. S. A., unless otherwise expressly noted.

Sec. 14406 provides as follows:

"Any number of persons, not less than twelve (12), may associate themselves together as a co-operative association, society or exchange, having all the incidents, powers and privileges of corporations, for the purpose of conducting any agricultural or mercantile business on the co-operative plan, including the buying, selling, manufacturing, storage, transportation or other handling or dealing in or with by associations of agriculturists, of agricultural, dairy or similar products, and including the manufacturing transformation of such articles into products derived therefrom, and for the purpose of the purchasing of or selling to all shareholders and others groceries, provisions, and all other articles of merchandise. For the purposes of this section the words 'association,' 'company,' 'corporation,' 'society' or 'exchange' shall be construed to mean the same." (Emphasis supplied.)

On one side, it is asserted that the mercantile business authorized by said section is limited to "(1) to dealing with or by associations of agriculturists, (2) to agricultural, dairy or similar products, (3) to manufacturing products derived from agricultural, dairy or similar products, and (4) to purchasing or selling groceries, provisions and all other articles of merchandise," so that said act does not expressly or by implication authorize the incorporation of an electric utility company. Whereas, respondent contends that the enumeration following the word "including" (where it appears the first time) does not limit or restrict its authority to engage in a mercantile business, but that, on the contrary, it is used as one of enlargement, and bears the meaning of "also" or "and"; that said section authorizes the formation of cooperatives "to engage in either (1) any agricultural business; (2) or any mercantile business, or (3) a business for the purpose of purchasing or selling to all shareholders or others any article of merchandise." It expressly disclaims being an association of agriculturists, or an agricultural cooperative, but contends that electricity is a commodity or article of merchandise, and hence in buying and selling electricity, or engaging in the "electric business," it is both conducting a mercantile business, and a business of buying and selling an article of merchandise, such as is expressly authorized by said statute.

██ It is a rule of statutory interpretation, hardly requiring citation of authority, that every word, phrase and sentence in a statute should be given some meaning, if possible. State v. Weatherby, 350 Mo. 741, 168 S. W. 2d 1048; Nordberg v. Montgomery, 351 Mo. 180, 173 S. W. 2d 387. Proceeding, then, to a determination of the effect to be given the enumeration following the word "including", either as a restriction upon, or enlargement of, the general language which precedes it, we find that the Supreme Court of the United States has said that in its ordinary sense "including" is not a term of enlargement but such "is its exceptional sense, as the dictionaries and cases indicate." [Montello Salt Co. v. Utah, 221 U. S. 452, 466.] The term has "various shades of meaning, sometimes of restriction and sometimes of enlargement." See 42 C. J. S., pp. 525-527, and Cannon v. Nicholas, 80 F. 2d 935, where the authorities are collated. It was pointed out in Phelps Dodge Corp. v. Labor Board, 313 U. S. 177, 189, that the term is not one of all embracing definition, but may connote simply an illustrative application of a general principle, or preface an illustrative example of a general power already ██ granted, Helvering v. Morgan's, Inc., 293 U. S. 121, 125. It has also been defined "as having an accumulative sense, and as classing that which follows with that which has gone before." Maben v. Rosser, 24 Okla. 558, 593, 103 P. 674, 676. Was it so used in this instance?

██ Here the statute authorizes the creation of cooperatives "for the purpose of conducting any agricultural or mercantile business . . . including the buying, selling, manufacturing, storage, transportation or other handling or dealing in or with by associations of agriculturists, of agricultural, dairy or similar products." We cannot escape the conclusion that the foregoing enumeration is rendered meaningless and useless if it was not intended to qualify and limit the scope of "any agricultural or mercantile business," because the latter words, standing alone, encompass the whole field, and if such was the legislative intent, it was unnecessary to say more. We think it is clear that the word "including" was used restrictively in the sense of its synonyms "comprising; comprehending; embracing," and not as introducing elements constituting an enlargement of the purposes theretofore authorized. If we are correct in this conclusion, then it follows that respondent, not being an association of agriculturists (if for no other reason) is engaging in a business not authorized by the law under which it was organized.

██ Moreover, we are of the opinion that an electric utility business is neither a mercantile business nor one "for the purpose of the purchasing or of selling to all shareholders and others groceries, provisions and all other articles of merchandise" within the meaning of the statute. "Companies engaged in the business of supplying electricity are commonly referred to as light and power companies. Such term is found in our legal digests. See Descriptive Word Index,

American Digest System, 33 Am. Jur. 1008. Light and power has become recognized as a generic term describing companies which furnish electricity." Union Electric Co. v. City of St. Charles, 352 Mo. 1194, 181 S. W. 2d 526. We think if the Legislature had intended to authorize the creation of light and power cooperatives by the act in question it would have said so directly, and not through the use of language which requires the strained and unnatural construction that they are merchants. This view is fortified upon a consideration of the Rural Electric Cooperative Act, Laws 1939, p. 298, now Art. 7, Chap. 33, which expressly provides for the formation of cooperatives for the purpose of "supplying electric energy and promoting and extending the use thereof in rural areas."

█ Respondent urges upon us the proposition that we should, in the exercise of a sound discretion, dismiss the proceeding as one not prosecuted in the public interest. But in this connection we are confronted with the constitutional provision (Art. XI, Sec. 5) that "no corporation shall engage in business other than that expressly authorized in its charter, or by law . . . ." We think this question, too, is adequately treated by the report of the Special Commissioner wherein he says:

"There is no element of estoppel in the present case, nor any question of laches. None was pleaded or proved. Each step respondent has taken toward the acquisition of the M. E. P. properties has been contested. Attempts were made to enjoin the consummation of the transaction pending a determination of the questions here involved. Respondent resisted the attempts to enjoin its purchase, and in its suggestions in opposition to the injunction stated:

'. . . And no injury can result from such a decree, because in rendering a judgment of ouster the court has the power to protect everyone concerned by making provision for a suitable period after which the order of ouster is to become effective, and to grant respondent an opportunity to reorganize and continue operating under authority of other statutes available to it for the purpose of reincorporation.'

"The purchase of the M. E. P. properties by Sho-Me was consummated after this proceeding in quo warranto was instituted and with full knowledge that this proceeding might result in a judgment of ouster against it. The respondent made provisions for just such a contingency. In the minutes of one of its meetings it appears that the attorney for respondent explained to the board of directors that some objections were being made to a closing of the purchase agreement until after final decision had been reached in pending litigation, including this proceeding. After explaining the reasons for the objections the attorney explained the proposed agreement which had been tentatively agreed upon, assuring █ the sellers of protection in the event of an adverse decision.

"Following the explanation the board of directors unanimously adopted a resolution providing, among other things:

'Whereas, quo warranto proceedings have been instituted against the cooperative and are now pending before the Supreme Court of Missouri . . .

'Now, Therefore, be it resolved that the President is authorized on behalf of the Cooperative to execute and deliver under its corporate seal, which the secretary is directed to affix and attest, as many counterparts as he deems advisable of an agreement to be entered into among the Cooperative, United States of America, acting through the Administrator of the Rural Electrification Administration, Missouri Electric Power Company, Central States Power & Light Corporation, Central States Utilities Corporation, and Ogden Corporation, whereby the Cooperative renounces any right it may have to require from any or all of the parties to the agreement repayment of the purchase price in the event of an adverse decision affecting the validity of the Agreement or the right of the Cooperative to own and operate the System, said agreement to be substantially in the form of the agreement submitted to this meeting, with such changes in the form as the President shall deem advisable.'

"As authorized by this resolution of the Board of Directors, the president and secretary of the respondent entered into an agreement, which provides, among other things, the following:

'Section 2. If, in the judgment of Sho-Me or the Administrator, Sho-Me's title to the System, or its right to own or operate the System, shall be found to be defective at any time within three (3) years after the closing date, or if it shall be finally determined by a court or commission of competent jurisdiction that Sho-Me is not a corporate entity or that Sho-Me lacks capacity to own or operate the System, then Sho-Me with the approval of the Administrator, or the Government acting through the Administrator, shall designate a person or persons, or corporation or corporations (such person or persons, or corporation or corporations, being hereinafter called the 'Nominee'), to take title to the System, and the Government shall (a) enter into a loan contract with and accept delivery of a note and of a mortgage or deed of trust from the Nominee, or (b) enter into an agreement with the Nominee, providing for the assumption by the Nominee of all of Sho-Me's obligations to the Government. Promptly upon designation of the Nominee as provided in this Section 2, any or all of the Sellers shall, at the request of Sho-Me or the Administrator execute and deliver to the Nominee a deed and bill of sale which shall have been executed and delivered by MEP to Sho-Me on the closing date, and shall make, execute, acknowledge and deliver, or cause to be made, executed, acknowledged and delivered all such further instruments and conveyances, and shall take or cause to be taken all such further action as may reasonably be requested by Sho-Me, the Nomi-

910

nee or the Administrator to effectuate the intention of these presents. Thereafter, the Government shall release Sho-Me from any and all obligation to the Government arising out of any and all loans made to Sho-Me by the Government, acting through the Administrator.'"

In the light of these facts, said report recommends that respondent having "acted in good faith on advice of counsel and under an opinion of the Attorney General of Missouri, and to prevent injury to the present consumers of electricity generated or distributed by respondent that the judgment of the court be so conditioned as to afford respondent a reasonable opportunity to effectuate the reorganization for which respondent has already made provisions." Accordingly, the writ of ouster will issue, but respondent is granted the period of one year in which to effectuate its reorganization, if it is so advised, the court reserving jurisdiction of the case for such other and further action as may be deemed proper and appropriate in the premises. All concur except *Gantt, J.,* absent.