**UNION ELECTRIC COMPANY,
Plaintiff-Respondent,**

v.

**CUIVRE RIVER ELECTRIC COOPERATIVE, INC., Defendant-Appellant.**

**No. 38933.**

Missouri Court of Appeals,
St. Louis District,
Division Three.

Sept. 12, 1978.

Motion for Rehearing and/or Transfer Denied Oct. 13, 1978.

Application to Transfer Denied
Nov. 6, 1978.

---

Stockard, Andereck, Hauck, Sharp & Evans, Eugene E. Andereck, Allen W. Baker, Jefferson City, for defendant-appellant.

Keefe, Schlafly, Griesedieck, Ferrell, Francis X. Duda, Richard L. Adams, St. Louis, for plaintiff-respondent.

KELLY, Judge.

The Cuivre River Electric Cooperative, Inc., a rural electric cooperative incorporated under Chapter 394 RSMo. 1969, prosecutes this appeal from a judgment of the Circuit Court of St. Charles County, Missouri, permanently enjoining it from servicing an area annexed into the City of St. Peters with electrical power and energy, except with respect to twelve members of the cooperative who were being serviced prior to January 6, 1976, the day after the annexation of the area involved became effective, and those persons accepted as members who have or will become subsequent occupants of the twelve houses or places of business actually being serviced by it on January 6, 1976. We reverse and remand with instructions.

The respondent, plaintiff in the trial court, instituted this litigation to enjoin the appellant from building, constructing, or in any way extending an electric line into or within the City of St. Peters, Missouri, because the City of St. Peters, it alleged, had a population of more than 1500 inhabitants and was not a "rural area" as that term is defined in § 394.020(3) RSMo. 1969; the respondent alleged, therefore, the appellant had no power or authority to sell and distribute electricity therein.

The facts are that the appellant is a rural electric cooperative financed almost entirely by loans from the Rural Electrification Administration of the United States Department of Agriculture. It is a not-for-profit operation, consumer owned and operated. The respondent is a private investor owned public utility organized as a corporation under Chapter 351 RSMo. 1969 and operating under a certificate of convenience and necessity from the Missouri Public Service Commission to provide electric service to both the City of St. Peters and the County of St. Charles, including the area here in issue.

Prior to the institution of this suit both parties were servicing areas in and around the City of St. Peters, a fourth class City. On June 21, 1972, the appellant entered into an Electric Service Agreement with Kodner Development Company, Inc., to provide electric service to an area of 137 acres, identified as the Cave Springs Estates. On August 18, 1972, appellant also entered into a second Electric Service Agreement to service another project, the Sunny Meadows Estates Subdivision. By these service contracts both of the parties thereto were required to comply with all present and future orders of the Missouri Public Service Commission.

On January 5, 1976, the City of St. Peters annexed approximately 80 acres of unincorporated land situated along its eastern boundary in St. Charles County and thereby took into the City limits Plat 3 and Lot 26 of Plat 2 of the Cave Springs Estates Subdivision.[1] Prior to the annexation, appellant was servicing three homes in Plat 3 and also a home on Lot 26 of Plat 2 of the Cave Springs Estates Subdivision. Five other homes in Plat 3 of the subdivision were completed shortly after the date of annexation. Except for these eight homes, Plat 3 of the subdivision was undeveloped.

A dispute then arose over which corporation was entitled to service those homes in Plat 3 of the Cave Springs Estates Subdivision completed after the date of the annex-

---

1. Our examination of the record on appeal causes us to conclude that it is clear that portions of the Cave Springs Estates Subdivision and Lot 26 of Plat 2 of said Subdivision were annexed; while the respondent claims that Plats 3 and 4 of the Subdivision were annexed as well as Sunny Meadows Estates Subdivision. The City Engineer, Mr. Pickett, respondent's witness, testified, however, that there was no recorded Plat 4 of Cave Springs Estates Subdivision. Respondent, in its brief, states that although the relationship of Sunny Meadows Estates Subdivision to this action is obscure, it may be that a portion of the Cave Springs Estates Subdivision was subsequently subdivided to become Sunny Meadows Estates Subdivision. However, the citations to the transcript to support this interpretation do not bear this out. Nevertheless, we believe that the uncertainty surrounding Plat 4 of Cave Springs Estates Subdivision and Sunny Meadows Estates Subdivision is not crucial to the result reached here, due to the fact that the principal dispute centers on Plat 3 of Cave Springs Estates Subdivision, a relatively undeveloped plot of land at the time of annexation.

ation. When discussions between the parties proved futile, the respondent instituted this cause of action on April 5, 1976, and obtained a Temporary Restraining Order enjoining the appellant from building, constructing, or in any way extending an electric line into the City. At the time of trial, June 15, 1976, appellant was servicing eleven residences and one business in the annexed area. Of these residences, one was situated on Lot 26 of Plat 2 of the Cave Springs Estates Subdivision and four were located in Plat 3 of the same subdivision. The appellant also offered evidence that prior to the issuance of the temporary restraining order of April 5, 1976, other homes in the area had requested service be furnished to them and that preparation for connecting service to these homes, including the installation of a transformer, had taken place.

■ Appellant, incorporated pursuant to the provisions of Chapter 394 RSMo. 1969, "The Rural Electric Cooperative Law," has as its primary purpose the rendering of electric service to members of the cooperative living in a rural area not otherwise served. *Missouri Public Service Co. v. Platte-Clay Elec. Co-op*, 407 S.W.2d 883, 894[18] (Mo.1966). The term "rural area" is defined for the purposes of The Rural Electric Cooperative Law to mean "any area of the United States not included within the boundaries of any city, town or village having a population in excess of fifteen hundred inhabitants, and such term shall be deemed to include both the farm and nonfarm population thereof." Section 394.-020(3) RSMo. 1969. The question for resolution then is whether, on April 6, 1976, the City of St. Peters had a population in excess of fifteen hundred inhabitants.

However, the crucial issue is, how may the population of the City of St. Peters on April 6, 1976, be ascertained?

Appellant contends that the population of St. Peters is to be determined in accordance with the provisions of § 1.100(1) RSMo. Respondent, on the other hand, contends it is a fact issue which may be proven by other competent evidence, e. g. a field survey conducted by the Bureau of the Census, Department of Commerce, in 1976 refined and incorporated into an official publication of the Department of the Treasury utilized for the Federal Revenue Sharing entitlement purposes; the voter registration records of the City prepared in summary form by the St. Charles County Clerk from the official voter registration cards for the County of St. Charles; etc.

The trial court adopted the respondent's argument on this Point, and in that we conclude reversible error resulted.

Section 1.100(1) RSMo. 1969 specifically provides that the population of any political subdivision of the state for the purpose of representation *or other matters* including the ascertainment of the salary of any county officer for any year or for the amount of fees he may retain or the amount he is allowed to pay for deputies and assistants is determined on the basis of the last previous decennial census of the United States effective as of July 1st of each tenth year after 1961.

The General Assembly in enacting Chapter 394 RSMo. 1969 and authorizing the organization of rural electric cooperatives in cities having a population of less than 1500 inhabitants did not provide therein the method for determining the population for the purposes of the Act. We must look elsewhere for a method whereby a city's population may be determined when a rural electric cooperative may no longer serve an area by reason of the fact it ceases to be a "rural area" within the meaning of the Law.

It is apparent that § 1.100(1) RSMo. 1969 does not definitively require among the purposes enumerated therein, the use of the decennial census in cases of this kind. However, in addition to representation, and the ascertainment of salaries and fees of county officers and the pay allowed for deputies and assistants, specifically mentioned, it does make it mandatory to use the decennial census to determine the question of population of any political subdivision of the state in "other matters."

Respondent argues that inasmuch as the word "including" follows "other matters," and then specifies the "other matters" referred to therein, the term "including" is used in a restrictive sense as a word of limitation and not as one of enlargement. Thus, respondent contends, § 1.100(1) RSMo. 1969 is not controlling here and other evidence of population is admissible on that issue.

■ Respondent relies on *State v. Sho-Me Power Co-op*, 354 Mo. 892, 191 S.W.2d 971, 977[2] (banc 1946) and a number of cases from other jurisdictions, to support its contention in this respect. The cases leave little doubt that the term "including" is ambiguous, and its meaning may vary according to the context of the statute in which it appears. *St. Louis County v. State Highway Commission*, 409 S.W.2d 149, 152[5] (Mo.1966). Ordinarily, however, it is not a word of limitation, but rather, one of enlargement. *St. Louis County v. State Highway Commission*, supra. From a reading of the cases cited by both the respondent and the appellant in support of their contradictory positions, we have concluded that in most instances the term "including" is one of enlargement and we hold that it was so used in this statute for reasons more fully explored hereinafter.

Respondent further contends that the statute is not applicable to the facts of this case because the determination of the population of an area to ascertain if it has ceased to be a "rural area," as that term is defined in § 394.020(3) RSMo. 1969, is not among the "other matters" referred to in § 1.100 RSMo. 1969.

To support this contention, respondent argues that the words "other matters" are ambiguous in the context of the statute and are limited to those "matters" of the same or similar kind enumerated immediately following the term, i. e. (1) the ascertainment of the salary of a county officer for any year, (2) the amount of fees a county officer may retain, or (3) the amount a county officer may pay for deputies and assistants.

We agree with respondent that the term "other matters" is ambiguous. The word "other" has been defined as " 'different and distinct from that already mentioned'." *Missouri Pacific Railroad Company v. Campbell*, 502 S.W.2d 354, 358 (Mo.1973); Black's Law Dictionary, 4th Ed. "Matters" has many meanings. We shall not attempt to set them out herein, but shall resort to decisional law of the appellate courts of this state to discern whether they have applied the restricted construction of the terms "other matters" contended for by the respondent in cases where the statute came into play.

The word "population," is defined as "the whole number of people or inhabitants occupying a specific geographical locality," Webster's Third New International Dictionary. When the word has been employed for the purpose of classification in legislative enactments, the method for determining population has generally been a legal census.

■ A "census" is an official enumeration of the inhabitants with details of sex, age, family, etc., and the public record thereof; it is not merely a sum total, but an official list containing the names of all of the inhabitants. *State ex rel Ryan v. Wooten*, 139 Mo.App. 221, 122 S.W. 1101, 1103[4] (1909). A "census" is not an estimate of the population. *State ex rel. Reynolds v. Jost*, 265 Mo. 51, 175 S.W. 591, 597[5] Ann. Cas. 1917D, 1102 (1915).

Section 1.100(1), as it now exists, is the result of a legislative revision which took place in 1949, and resulted in the consolidation of §§ 654 and 13430 RSMo. 1939. Section 654, RSMo. 1939, read as follows:

"All matters to be based on United States census.—All representation or other matters heretofore or now based on the state census shall be based on the United States census of this state."

Section 13430, RSMo. 1939 read as follows:

"Last decennial census to determine population—The last previous decennial census of the United States shall be the basis for determining the population of any county in this state for the purpose of

ascertaining the salary of any county officer for any year, or the amount of fees he may retain, or the amount he shall be allowed to pay for deputies or assistants."

Simultaneously, the legislature repealed § 2495 RSMo. 1939 because the salaries to be paid to judges of county courts, based upon the population of the county they served, was adequately covered by the newly enacted statute.

It was under these circumstances that the term "other matters" was retained in the new statute, § 1.100(1).[2]

Although the Rural Electric Cooperative Law limits the formation of cooperative, nonprofit, membership electric corporations for the purpose of supplying electric energy and promoting and extending the use thereof in rural areas, § 394.030 RSMo. 1969, and the term "rural area" is defined by § 394.020(3) RSMo. 1969, in terms of population, nowhere in Chapter 394 has the legislature made specific provision for the method to be employed in determining when the population of the area being serviced by a cooperative ceases to be a "rural area" by reason of increase in population or annexation into a city with a population in excess of 1500 inhabitants, so that the cooperative's rights to service the area are curtailed or restricted pursuant to the provisions of § 394.080(4) RSMo. 1969.[3]

In a number of cases where change in population triggered changes in representation, in the amount of salaries to be paid public officials, in number of deputies to be hired, etc., and no specific method was legislated for the determination of the population, resort has been had to either former §§ 654 or 13430, and their predecessors, to ascertain the population of a political subdivision of this state.

In *Hardin v. Jefferson County*, 347 Mo. 410, 147 S.W.2d 643 (1941) the question before the court was whether the judges of the county court in Jefferson County constituted a Board of Overseers under § 7892 RSMo. 1929, and whether they did depended upon whether the county had a population of not less than 50,000 nor more than 200,000 inhabitants. Because the legislature provided no special statutory method to determine the population of a county under § 7892, the court relied on § 654 RSMo. 1929, and said, 147 S.W.2d 644, l.c. 644[1]:

"Absent such a method, the question of population is fixed by the last decennial census, . . ."

In *Reals v. Courson*, 349 Mo. 1193, 164 S.W.2d 306[5] (1942), a group of resident tax payers instituted a suit against the secretary and the members of the Board of Education and the School District of University City for the purpose of enjoining them from holding an election to test the wishes of the District's voters as to whether

2. Section 1.100. POPULATION, HOW DETERMINED

1. The population of any political subdivision of the state for the purpose of representation or other matters including the ascertainment of the salary of any county officer for any year or for the amount of fees he may retain or the amount he is allowed to pay for deputies and assistants is determined on the basis of the last previous decennial census of the United States. For the purposes of this section the effective date of the 1960 decennial census of the United States is July 1, 1961, and the effective date of each succeeding decennial census of the United States is July first of each tenth year after 1961; except that for the purposes of ascertaining the salary of any county officer for any year or for the amount of fees he may retain or the amount he is allowed to pay for deputies and assistants the effective date of the 1960 decennial census of the United States is January 1, 1961, and the effective date of each succeeding decennial census is January first of each tenth year after 1961.

3. Section 394.080(4) provides that when an area ceases to be rural by reason of increase in population or annexations into a city with a population in excess of 1500 inhabitants, the cooperative may continue servicing the area until such time as the municipality, or the holder of a franchise to furnish electricity in the municipality purchases the physical property of the cooperative located in the area. The cooperative may not, however, once the population limits have been exceeded, extend service to owners of homes and businesses built after annexation on lots purchased from pre-annexation members who had subdivided their original land holding. *Missouri Public Service Co. v. Platte-Clay Elec. Co-op*, 407 S.W.2d 883, 893[19] (Mo.1966).

they desired to authorize an additional bonded indebtedness to borrow money and issue bonds for the purpose of providing further funds for general school purposes. The question before the court was the constitutionality of the statutes authorizing the Boards of Directors of School Districts formed of cities and towns in counties having more than 200,000 and less than 450,000 inhabitants to increase the bonded indebtedness of the school district. The grounds for the attack against the statute were that it was a special law in violation of Article IV, Section 53(2)(19)(32) Mo.R.S.A. This Act, enacted by the Sixty-first General Assembly in 1941, provided, in the final section thereof, that the provisions of the Act would expire on January 1, 1946. On the basis of this provision the court concluded the Act to be unconstitutional. The reasoning of the court, 164 S.W.2d l.c. 309, was that since the Act itself made no provision for determining the population of a district or county and the class could therefore be determined only by the United States census for 1940, it was conclusively demonstrated that no district other than the School District of University City could ever come within the provisions of the Act. The court quoted from *Hardin v. Jefferson County*, supra, the holding that in the absence of a method for the determination of population in the Act itself, where population is the basis for classification, the method to be resorted to was that required by § 654 RSMo. 1939, i. e. the last national decennial census.

■ We hold, therefore, that the term "other matters," as used in § 1.100(1) RSMo. 1969, is not restricted to those matters specifically enumerated after the word "including."

■ We further hold that the last decennial census is the exclusive method to be employed in the determination of the population of the City of St. Peters in this case

and the other evidence of population offered by the respondent and admitted into evidence by the trial court was not, in this case, competent evidence of population.[4]

The respondent argues that the last decennial census is not the exclusive method for proving population. It takes approximately the same position the appellants in *Reals v. Courson*, supra, did, i. e. that since no provision was made for the method of determining the population, the population of the City might be established in any authentic manner, and the decennial census merely furnishes evidence of the fact of population.

The power of the legislature to prescribe the evidence by which the population of the cities of this state should be determined was recognized in *Dunne v. Kansas City Cable Ry. Co.*, 131 Mo. 1, 32 S.W. 641, 643 (1895). It was also recognized by the court in that case that the last decennial census was a proper vehicle for the determination of population of a city, and the impracticability of determination of population by judicial investigation if insisted upon every time a jury was impaneled was pointed out.

Since 1889, when the law providing for the taking of a state census was repealed, the United States census has been made the basis for categorization by population in the legislative enactments of the General Assembly of Missouri. The reason for employing the national census as the gauge of population is definiteness, trustworthiness, and accuracy, and the fact that it is taken every ten years. *Dunne v. Kansas City Cable Ry. Co.*, supra.

■ Because of the accuracy of the national decennial census it is, except where otherwise specifically provided, the method for the determination of population of cities in this state. *Reals v. Courson*, supra. The Supreme Court of Missouri in *City of*

4. There is no evidence in this case that the City of St. Peters had a special census authorized by § 71.160 RSMo. 1969, and there was no contention by either of the parties that the census authorized by § 81.020 RSMo. 1969, is applicable to this case; nor do we rule on the question

whether any legally authorized census taken post-annexation of the recently annexed area could be employed to determine the population. There is no evidence in this case of such a census.

*Bridgeton v. Gilstrap,* 463 S.W.2d 908 (banc 1971), a declaratory judgment proceeding to resolve a dispute between St. Louis County and several of the ninety-seven municipalities situate therein over the allocation of revenue from a county cigarette tax, was confronted with the issue of what population figures should be employed.

The question in *City of Bridgeton* was whether the tax revenues were to be allocated solely on the basis of decennial census population figures, or on the basis of population figures shown by special municipal censuses taken pursuant to § 71.160 through § 71.180 RSMo. 1969.

The statutes authorizing the cigarette tax and providing for its allocation, §§ 66.340 and 66.350(2), Laws 1967, did not designate the census upon which the population formula should be determined. The court held that it was the federal decennial census, or the latest census that determined the total population of the county and all of the political subdivision therein, which was the basis for the formula for distribution of the tax revenues. In doing so the court reasoned, l.c. 914:

> "Common sense makes it self-evident that recognition of population changes must be on a periodic basis. We cannot believe that the legislature intended to set the stage for competitive special census taking by ninety-seven (97) governmental units, which could not only dissipate the tax revenue received, but also destroy any chance of budgetary planning and continuity of service to those paying the tax."

We believe, that although we are not confronted here with the identical competing interests present in the *City of Bridgeton* case, the case before us for decision possesses some of the same inherent problems of competition presented therein. In ascertaining how the population of cities, towns and villages must be determined in a case of this kind one need only read the litigation fomented between Missouri Public Service Company and the Platte-Clay Electric Cooperative, Inc.[5] to appreciate the potential litigation which could result when the forty-three rural electric cooperatives of the state find their areas of service threatened by annexation into any city, town or village where the question is whether said city, town or village has a population in excess of fifteen hundred inhabitants. We do not believe the legislature intended the result which would follow should we hold that the population of the City of St. Peters could be established in any way other than by an official census. Evidence of any other kind does not supply the certitude necessary to establish population where classification by population is employed in enactments by legislative bodies.

While it may be that the population of a particular community has increased greatly since the last taking of the decennial census, nevertheless, some definite period must be agreed upon for the determination of the question; otherwise, there would be endless confusion. As a result, it has been uniformly held that changes in classification upon the basis of population are not permissible until there has been a legal ascertainment thereof. In recognition of this principle, the legislature has made provision for updating population between the national decennial census by enactment of §§ 71.160 and 71.170 RSMo. 1969, authorizing a special census, and §§ 81.010 and 81.030 RSMo. 1969, authorizing special charter cities and towns to take a census for the purpose of a change of classification. A census taken under either of these statutes has the force and effect of a state or national census and becomes the legal census and population of the city or town for all purposes. Neither of these censuses has been taken so far as we can learn from the record on appeal.

■ Having decided that the exclusive method for proof of population in this case was the last United States decennial census, that enumeration made in 1970, we find from this record that the trial court, as it could pursuant to the provisions of § 490.-700 RSMo. 1969, took judicial notice that the population of the City of St. Peters is 518 inhabitants.

5. See: 532 S.W.2d 800 (Mo.App.), 435 S.W.2d 350 (Mo.) and 407 S.W.2d 883 (Mo.).

In the absence of any legal census rebutting this evidence, we hold that the trial court's judgment that "the Municipality of St. Peters, Missouri, on April 6, 1976, had a population in excess of one thousand five hundred (1,500) inhabitants" is not supported by any substantial evidence, it erroneously declares the law with respect to the method by which the population of the municipality must be determined under the facts of this case, and it erroneously applies the law. We are of the firm belief that under the facts and the law the judgment is wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

For the foregoing reasons we reverse the judgment of the trial court and remand the cause thereto with directions for it to enter an order setting aside and holding for naught its judgment. We further direct that the injunction directed against the appellant and heretofore entered, be set aside and for naught held, and that a new judgment be entered dismissing respondent's petition and entering judgment for the appellant.

GUNN, P. J., and WEIER, J., concur.