**CITY OF BRIDGETON, a Municipal Corporation, Plaintiff Appellant,**

**v.**

**Thomas C. GILSTRAP, Collector of Revenue, Defendant Cross-Plaintiff, Respondent,**

**v.**

**ST. LOUIS COUNTY et al., Cross-Defendants, Respondents,**

**and**

**City of Dellwood, City of Florissant, City of Hazelwood, Cross Defendants, Appellants.**

**No. 55634.**

Supreme Court of Missouri,
En Banc.

March 8, 1971.

William A. Richter, St. Louis, for appellant, City of Bridgeton.

James L. Sullivan, St. Louis, for appellant, City of Dellwood.

Jack Muehlenkamp, St. Louis, for appellant, City of Florissant.

R. J. Slater, St. Louis, for appellant, City of Hazelwood.

Joseph B. Moore, St. Louis County Counselor, Thomas W. Wehrle, Deputy County Counselor, Clayton, for respondent, St. Louis County.

William R. Dorsey, Clayton, for respondent, City of St. Ann.

John J. Morris, University City, for University City. ·

Raymond I. Harris, Harris, Fortus & Anderson, Clayton, for City of Bel-Ridge, City of Pine Lawn and the City of Wellston.

Frank P. Motherway, St. Louis, for the City of Overland.

A. E. Nick, Ferguson, for City of Ferguson.

G. F. Gunn, Brentwood, for City of Brentwood.

Edgar G. Boedeker, Clayton, for City of Clayton.

Richard F. Provaznik, Richmond Heights, for the City of Richmond Heights.

John F. Mulligan, St. Louis, for the City of Northwoods.

MORGAN, Judge.

The basic question in this suit for declaratory judgment is whether the revenue from the St. Louis County cigarette tax, authorized by Section 66.340, V.A.M.S., is to be allocated among the county (the unincorporated area) and the municipalities in the county solely on the basis of decennial census population figures, or whether the revenue may be allocated on the basis of population figures shown by special municipal censuses taken pursuant to Sections 71.160 through 71.180. The trial court, after making certain findings of fact and conclusions of law, entered judgment: " * * that Thomas C. Gilstrap, Collector of Revenue of the Missouri Department of Revenue, State of Missouri, make distribution of the cigarette tax moneys imposed by the County Council of the County of St. Louis, Missouri, in accordance with the provisions of Section 66.350 V.A.M.S., and that after deducting the one percent (1%) collection fee and an amount equal to the net revenue in 1967 for those cities that are within the exception provided for in Section 66.350, and then to disburse the balance of said tax moneys based on the populations of St. Louis County and the cities, towns and villages therein, in accordance with the 1960 Federal decennial census, with adjustments for increases in population of cities, towns and villages by reason of consolidations and annexation."

We affirm the judgment entered by the trial court with one modification, which is: after the words "1960 Federal decennial census," that the words "or the latest census that determines the total population of the county and all political subdivisions therein" be added.

Initially, we point out that there are ninety-eight (98) parties to this suit, and we would only add to the present confusion if we sought to identify the specific pleadings, suggestions and arguments of each of the parties. Several defendants, by cross-claims against the collector, have joined plaintiff in challenging the present method of allocating such funds, which is in compliance with Opinion No. 425 of the Attorney General; some contend that the formula used prior to that opinion is proper; others submit that the judgment of the trial court is correct; and, some express no opinion as long as they receive their proper share.

In 1968 the Missouri Legislature enacted Senate Bill 25, authorizing any first class

charter county to impose a tax on the sale of cigarettes sold in the county, which is now codified as Sections 66.340 through 66.380 (Laws 1967, 1st Ex. Sess., p. 872, Secs. 1, 2, 3 and 4). Section 66.360 provided that "In the event such county levies such a tax no incorporated municipality located within such county shall levy a tax on the sale of cigarettes * * *." By reason of the latter section, enactment by the county of an ordinance imposing a cigarette tax had the effect of repealing the municipal cigarette tax of each of twenty-three cities or towns in St. Louis County. Of immediate interest is Section 66.350 which details the manner of allocation and distribution of the revenue derived from the county tax. It provides: "1. The county cigarette tax shall be collected by the division of collection of the state department of revenue. The division shall each day retain, from the county tax collected, one per cent of the amount collected and deposit that amount in the state general revenue fund to help defray the cost to the state of collecting and distributing this tax.

"2. On the first of each month the division shall distribute the balance of the tax collected during the previous month to the county that levied the tax and the cities, towns and villages located within the county in the following manner: to the county which levied the tax, a percentage of the distributable revenue equal to the *percentage ratio* that the population of the unincorporated areas of that county bears to the *total population of the county* and to each city, town or village located wholly within the taxing county; a percentage of the distributable revenue equal to the *percentage ratio* that the population of such city, town or village bears to the *total population of the incorporated area* of the taxing county and to each city, town or village located partly within the taxing county; a percentage of the distributable revenue equal to the percentage ratio that the population of that part of the city, town or village located within the taxing county

bears to the total population of the incorporated area of the taxing county; except that no city, town or village shall annually receive not less than an amount equal to the net revenue derived from its city cigarette tax in the year 1967." (Emphasis added.)

Of necessity, most of the parties agree that the statutory method of distribution, just quoted, is both clear and easy to follow. Basically, it provides that the one common denominator for division shall be "the total population of the county." After that portion (for the unincorporated area) is paid to the county, the statute does provide for distribution among the cities, towns and villages of the balance, based on the percentage ratio that the population of each municipality bears to the "total population of the incorporated area." However, as is obvious, the population in the incorporated area could only be that remaining after the population of the unincorporated area had been deducted from "the total population of the county." Nevertheless, the real crux of the dispute of the parties is the significance which some of them attach to the use of "total population of the county" in one instance and "total population of the incorporated area" in the other.

As shown, the statute does not specifically designate the census upon which the "total population of the county" will be determined, and other statutes must be considered to provide a basis for consideration of the arguments of any of the parties. They are:

Section 1.100—"The population of any political subdivision of the state for the purpose of representation *or other matters* * * * is determined on the basis of the last previous decennial census of the United States." (Emphasis added.) Section 71.-160 provides for the taking of a special census "whenever the council of any incorporated city * * * in this state shall be of the opinion that there has been a substantial increase or decrease of the population of such city * * * since the last preceding census * * *." Under the

statute, the special census is taken by a census supervisor appointed by the Governor, and the supervisor certifies the results of the census to the Secretary of State. Section 71.170 then provides: "* * * the population of such city or town, as given in such certificate of the supervisor, shall be the legal census and population of such city or town, *for all purposes whatsoever, under the constitution and laws of the state.*" (Emphasis added.) (Enacted, Laws 1921, p. 181, § 2.)

The Collector of Revenue used decennial census figures from the time of the first distribution in October of 1968 to August, 1969. Subsequently, demands were made for increased percentages of the money collected by numerous cities and towns which had taken a special census pursuant to Sections 71.160 through 71.180 or had annexed territory from the unincorporated area of the county. Others had consolidated or were in the process of taking special censuses at the time of trial. We need not detail all efforts of the collector to meet the many changes requested. It is sufficient to say that from receipt in October, 1969, of Opinion No. 425, until entry of judgment in this cause, he had followed the guidelines of that opinion. After considering each of the statutory provisions quoted herein, it was concluded by the Attorney General " * * * that, in determining the distribution of cigarette tax proceeds in a first class county with a charter form of government, only the federal decennial census can be used to determine what part of the funds will be given to the county for its unincorporated areas, but special censuses conducted pursuant to Sections 71.160–71.180, R.S.Mo. 1959, may be used to determine what part of the remaining fund will be distributed to each incorporated area in the county." It was further explained that: "The effect of this opinion can best be illustrated by an example. Assume that the County X was shown to have a population of one million persons in the 1960 federal decennial census. Assume also that the 1960 census showed that of this one million persons, eight hundred thousand lived in incorporated areas and two hundred thousand lived in unincorporated areas. Further assume that in June, 1969, after the state took out its one percent for collection pursuant to Section 66.350 (§ 1), there remained to distribute to County X $50,000 representing the county cigarette tax. Then, on the first of July, 1969, the following distribution would be made.

"The first distribution, pursuant to Section 66.350 (§ 2), would go to the county, representing the share for the unincorporated areas of that county. As stated earlier, this distribution must be made on the basis of the federal decennial census, because the county has no authority to conduct a special census. Therefore, twenty percent of the cigarette tax collections would first be distributed to County X. The twenty percent being the ratio that the unincorporated population of County X bears to the total population of County X based on the 1960 federal decennial census (200,000/1,000,000=20%). So $10,000 of the $50,000 would be first distributed to the county (20% of $50,000= $10,000).

"This distribution then leaves $40,000 to be allocated among the incorporated areas of County X. Assume that there are three incorporated areas in County X, City A, City B, and City C. The 1960 census shows that these incorporated areas had the following population:

"City A—100,000;

"City B—300,000;

"City C—400,000.

However, assume that both City A and City B have conducted a special census, pursuant to Sections 71.160 through 71.180, R.S.Mo. 1959, but that City C has not conducted such a special census. The new population figures for the three cities would then be as follows:

"City A—200,000 (an increase of 100,000);

"City B—400,000 (an increase of 100,000);

"City C—400,000 (the same, because there has been no special census in City C).

As stated earlier, it is proper to use special censuses in making the distributions of the county cigarette tax to incorporated areas in the county. Thus, using whichever census is applicable, depending upon whether or not an incorporated area has conducted a special census, we see that the incorporated area of County X now has a total population of 1,000,000. This figure is based upon the sum of the population determined by the federal decennial census in City C, and the sum of the populations determined by the special census in Cities A and B. The second distribution of the cigarette tax is then made to each incorporated area in the ratio that that incorporated area's population bears to the population of all the incorporated areas in the county. Given these figures, the following distribution of the remaining $40,000 would be made:

"City A—20% (200,000 divided by 1,000,000=20%) or $8,000;

"City B—40% (400,000 divided by 1,000,000=40%) or $16,000;

"City C—40% (400,000 divided by 1,000,000=40%) or $16,000.

"There is the further complication however, in that Section 66.350 provides that if a city had its own cigarette tax in 1967, in no case would that city receive less from the county cigarette tax than it received from its own cigarette tax in 1967. If, at the end of the year, it was discovered that a city had received less, a recomputation and adjustment would have to be made in the payment of the year's proceeds from the county cigarette tax so that the city in question would receive the same amount that it received from its own tax in 1967."

As to Opinion No. 425, it is quite evident that it represents a commendable effort to give force and effect to each of the statu-

tory provisions heretofore quoted. However, for several reasons the formula suggested fails to reach the basic objective of Section 66.350, which is to divide the tax revenue among the many governmental units on a percentage ratio that the population of each bears to the whole. In looking at the example given, it is seen that the unincorporated area with the hypothetical population of 200,000 is allotted $10,000, while City A with 200,000 is allotted $8,000 or $2,000 less. Obviously, it is a mathematical certainty that such discrepancies will occur ninety-six times when the common denominator is changed from 1,000,000 to 1,200,000. Further, the statute clearly says that the county will receive a percentage based on the "total population of the county." Assuming, again, the increase of 200,000 in the incorporated area, it can not be argued but that the total population of the county has increased by the same amount. After admitting this truth, it becomes readily apparent that the amount previously allotted to the unincorporated area is incorrect. If the new denominator of 1,200,000 is truly the actual population of the whole county, the fractional share of the unincorporated area would be less than that allotted to it. As shown by the record, the trial court asked a very relevant question when inquiry was made of plaintiff as to whether or not it could show where its new residents came from. Since it could not, the answer is open to speculation. If the increase came from some of the other cities or towns in the county, the total population of the county would remain the same, but each of the other ninety-five municipalities would be penalized proportionately unless in self-defense they immediately took a special census of their own to show their increase had been comparable to that of plaintiff city. Likewise, if it be assumed the increase came from the unincorporated area, the formula suggested does not allow for a decrease to that area, but again makes the same deduction from all other municipalities. Such examples of the inequitable result called for are unlimited in number, but those

given are sufficient to show the fallacy of attempting to give effect to statutory provisions that are not applicable nor compatible with the problem presented.

Plaintiff city acknowledges the possibilities mentioned, but argues: "There is no statute authorizing a special census by a county. Certainly, it seems inequitable that a city could have a special census whereas a county cannot. However, the legislature chose to ignore this problem in enacting the cigarette tax statute to allow the allocation of the revenues to be determined by population established by a special municipal census." This argument is made while contending that the formula in Opinion No. 425 is incorrect, for the reason that plaintiff's claimed increase should be charged against the county as well as the other cities. This, in face of the possibility that the unincorporated area might have had a greater increase than that of plaintiff city and all of the other municipalities together, which, if it could be shown, would result in plaintiff receiving less even though it had the increase claimed.

Plaintiff city, while admitting the glaring inequities its claimed position would cause, contends it was the legislative intent that there be just such a result. This for the primary reason, that originally Senate Bill 25 provided that "the latest decennial census" would be the basis for distribution, and such words were deleted by a Senate-House Conference Committee prior to final passage. Certainly this fact can be considered in construing a statute, but in this case other facts are so much more compelling that we do not find the deletion to be persuasive, plus the fact the record shows the conference committee made many other substantial changes in the original bill. It is just as reasonable to assume that the intent of those making the deletion was that Section 1.100 would apply as well as to say Section 71.170 would, and in addition, such a secondary rule of construction should not be called on just to sustain an intolerable result. Plaintiff's

further argument that the "legislators were also presumptively aware of the commonly known fact of the substantial growth" taking place in many of the municipalities is answered by others submitting that the same presumption would apply to the unincorporated area of the county. Such respondents further contend that, "Total population has a common meaning understanding to all persons. It can be inferred, from their action, that the Legislature knew that the County was unable to take a special census and that the only time its total population could be determined would be when the federal decennial census was certified * * * [Section 1.100] * * * Since a special municipal census has no effect on the total population of the County it therefore should not be used to determine the percentage of the St. Louis County cigarette tax proceeds to be distributed to an incorporated city, town or village." In passing, we make the comment that the suggestion of plaintiff city, that the remedy is to provide a procedure for a special census by the unincorporated area, does not remove the fundamental weakness of its argument, i. e., that any one "special census" by one of ninety-seven (97) political subdivisions does not reflect that there has been a change in the "total population of the county."

The parties all agree that there are no precedents wherein the same factual situation was considered. However, while recognizing, as do the parties, that none are controlling by virtue of the varied statutory language used, we do believe the general principles announced in certain out-state cases are helpful. All pertain to the effect of certain "special censuses." In State ex rel. City of Casper v. Morgan, 80 Wyo. 1, 336 P.2d 791, 794, it was held: "We cannot encourage competition among the communities in this state in having a special census taken for the purpose of increasing their income from the gasoline license tax to the detriment of other communities. The term 'ratio' as used in the statute applies, we think, to the same

denominator, namely, that the same census shall apply throughout." In City of St. Louis Park v. King, 246 Minn. 422, 75 N.W.2d 487, the Supreme Court of Minnesota gave consideration to each of plaintiff's arguments and denied each of them. There the statute, providing for distribution of a cigarette tax, called for pro-rata division under the federal census with new percentages to be used after "each federal census." One city had a "special federal census" and the court denied a requested change in distribution. After recognizing that "the plaintiff's population is only one factor in a variable fraction," the court said, "We cannot assume that the population of other state units of government, nor that the total population of the state of Minnesota, would remain constant from April 1, 1950, to the present. Obviously, this assumption would be necessary to sustain plaintiff's contention." It was said in Harp v. Abrahamson, Iowa, 80 N.W.2d 505, 507, that, "Ratio, as defined by Webster's International Dictionary, means 'the quotient of one magnitude divided by another of the same kind'" * * * and if different censuses are used, "Clearly such magnitudes are not of the same class." Compare City of Bisbee v. Williams, 84 Ariz. 141, 317 P.2d 567.

■ In addition, it is a known fact that there are continuing population shifts, and that even plaintiff's new special census perhaps does not precisely establish its present population. The same is probably true of the new 1970 Federal Census. Common sense makes it self-evident that recognition of population changes must be on a periodic basis. We cannot believe that the legislature intended to set the stage for competitive special census taking by ninety-seven (97) governmental units, which could not only dissipate the tax revenue received but also destroy any chance of budgetary planning and continuity of service to those paying the tax. The provision in Section 71.170 that a special census shall apply "for all purposes whatsoever" can not apply to Section 66.350 which specifies a special procedure for a special purpose. We need not decide if Section 71.170 applies only to the "internal" affairs of a city or what possible effect it could have in the relationship of such a city to others under a different set of facts or other statutory provisions.

■ Necessarily, we have reached these conclusions: (1) we do not believe it was the legislative intent to create the incongruous result plaintiff seeks, (2) Section 66.350 does not lend itself to the mathematical formula plaintiff suggests, and (3) plaintiff has failed to sustain its burden of proof because Section 66.350 does not provide for distribution on a per capita basis but on a percentage ratio—proof of an increase in population of one city does not ipso facto show an increase in its percentage ratio to the whole. Such a showing could be made only after a new census of the entire county and each political subdivision therein.

The judgment as modified is affirmed.

FINCH, Acting C. J., SEILER, HOLMAN, and BARDGETT, JJ., and SHANGLER, Sp. J., concur.

DONNELLY, J., not participating in decision.

HENLEY, C. J., not sitting when cause was submitted.