Dear Representative Hoblitzelle:
This is in response to your request for an Opinion of the Attorney General on the following three questions with respect to Section 66.620 VAMS:
 "(1) If a municipality was initially classified under the `Group A' (location of sale) method of distribution and effectively transferred to the `Group B' (population ratio) method of distribution, when must such municipality adopt an ordinance (as specified in the Act) and notify the Director of Revenue if the municipality wishes to transfer back to the `Group A' (location of sale) method of distribution, utilizing the 1980 permissive transfer authority?
 "(2) If a municipality has effectively transferred back to the `Group A' (location of sale) in the manner and under the facts set forth in the first inquiry, may that same municipality once again transfer to the `Group B' (population ratio) method of distribution?
 "(3) If a municipality is classified within the `Group B' (population ratio) method of distribution, and subsequent in time to the most recent Federal decennial census and the most recent census that determined the total population of the County wherein the municipality is situated and all political subdivisions therein, the municipality annexes additional territory and properly notifies the Director of Revenue thereof, are the residents of the newly annexed territory counted in determining the population figure for purposes of distribution of sales tax revenues? If the answer to the inquiry is affirmative, what is the acceptable procedure under the Act for determining such population?"
In response to your first inquiry, it is the opinion of the Attorney General that Subsection 2 of Section 66.620
authorizes a Group A city, which has previously transferred into Group B, to transfer back into Group A by action of its governing body during 1980 and every tenth year thereafter only. The pertinent language of Subsection 2 is as follows:
 "Beginning in 1980 and during every tenth year thereafter only, any such city, town or village which transfers from Group A to Group B may by adoption of an ordinance by its governing body cease to be a part of Group B and once again become a part of Group A. Within ten days after the adoption of the ordinance transferring the city, town or village from one group to the other, the clerk of the transferring city, town or village shall forward to the director of revenue, by registered mail, a certified copy of the ordinance. Distribution to such city as a part of its former group shall cease and as a part of its new group shall begin on the first day of January of the year following notification to the director of revenue, provided such notification is received by the director of revenue on or before the first day of July of the year in which the transferring ordinance is adopted. If such notification is received by the director of revenue after the first day of July of the year in which the transferring ordinance is adopted, then distribution to such city as a part of its former group shall cease and as a part of its new group shall begin the first day of January of the second year following such notification to the director of revenue."
The primary rule of statutory construction indicates that the intention of the legislature is to be discerned from the words of the statute itself, and, that the words of the statute are to be given their plain and ordinary meaning. State v.Kraus, 530 S.W.2d 684 (Mo. banc 1975); State ex rel. Zoological ParkSubdistrict v. Jordan of the City and County of St. Louis,521 S.W.2d 369 (Mo. 1975). In this instance the language of the statute states that the governing bodies of qualifying cities, towns and villages are granted authority to act, by passing an ordinance, in the years 1980, 1990, 2000, etc., but in no other years. That is, the governing body of the city may take the necessary action to pass the transferring ordinance only during calendar year 1980 and every tenth year following. The effective date of the transferring ordinance depends upon the date of certification to the Director by the clerk of the city transferring back into Group A. If the notification is received prior to July 1 of the year in which the ordinance is passed, it would become effective on the 1st of January of the year following. If notification is received after July 1 of the year in which the ordinance is passed, the ordinance would become effective on January 1 of the second year following.
Cities and other subdivisions of the State of Missouri only have such powers as are specifically granted to them by the General Assembly or necessarily implied in the grant of authority.State ex rel. City of Blue Springs v. McWilliams, 335 Mo. 816,74 S.W.2d 363 (1934); City of Richmond Heights v. Shackelford,446 S.W.2d 179 (St.L. Ct.App. 1969); City of BellefontaineNeighbors v. J. J. Kelley Realty and Building Company, 460 S.W.2d 298
(St.L. Ct.App. 1970). Further, "Any reasonable doubt concerning whether or not a municipal corporation possesses a given power must be resolved in the negative." State ex rel. Crites v.West, 509 S.W.2d 482, 484 (Mo.Ct.App. at Spr. 1974). Therefore, since the General Assembly authorized the governing bodies of qualifying cities to act "beginning in 1980. . ." it is clear that the governing body of a city may not pass an ordinance in any year other than 1980 in an attempt to have the transferring ordinance becomeeffective in 1980.
In response to your second inquiry, it is the opinion of this office that a qualifying city, having once exercised its option to transfer into Group B, could elect to transfer back into Group A only once. Again, the language of Section 66.620, given its plain and ordinary meaning, clearly reveals the intention of the legislature. Subsection 2 provides:
 "Once a Group A city, town or village becomes a part of Group B, such city may transfer back to Group A only once."
The language of the legislature permits no other interpretation. Inasmuch as Section 66.620 contains no express limitation on the number of times a Group A city may elect to transfer into Group B, it is our opinion that a city, which began in Group A, transferred to Group B, and transferred back into Group A, may elect to transfer back into Group B. This transfer would be the final transfer available to that city.
Your third inquiry consists of two parts: First, whether the expansion of a Group B city by annexation will alter the distribution of tax revenues to that city; and second, if the population of the annexed area is to be considered for the purposes of disbursement to the Group B city, how must the population be determined? Again Section 66.620 provides the primary guidance for the response to this question.
Subsection 2 of Section 66.620 sets out the distribution scheme for the proceeds of county sales tax. It also states:
 "For the purpose of sections 66.620 to 66.635, population shall be as determined by the last federal decennial census or the latest census that determines the total population of the county and all political subdivisions therein. . . ."
Subsection 3 of Section 66.620 indicates that, should the boundaries of a city be altered or expanded, the clerk of the municipality is required to forward a certified copy of the ordinance adding territory to the director of revenue. It further provides:
 ". . . Upon receipt of the ordinance and map, the tax imposed by sections 66.660 to 66.635 shall be redistributed and allocated in accordance with the new boundary disposition on the effective date of the change of the municipal boundary. . . ."
By virtue of Section 1.100, RSMo Supp. 1975, the State of Missouri relies upon the federal decennial census to determine the population of all political subdivisions within the state unless otherwise specified. As noted above, Section 66.620 specifically provides that the federal decennial census will be used to determine population for the purposes of Section 66.620. Such section also contains the language ". . . or the latest census that determines the total population of the county and all political subdivisions therein." This quoted language no doubt was made a part of the statute because of the holding of the Supreme Court of Missouri in the case of City of Bridgeton v. Gilstrap,463 S.W.2d 908 (Mo. banc 1971) where the Court held that special municipal census could not be used to determine the new population of a city for the purposes of allocation of cigarette tax receipts among the county and municipalities within the county. The total tax revenue was to be allocated according to the population ratios in much the same way as the county sales tax is to be allocated among the various components of "Group B." Thus, the language of the statute and the case law are to the effect that a census will not be given effect unless it determines both the population of the entire county and the population of each political subdivision therein. Any powers of a municipality to take a census cannot extend beyond its own physical boundaries. Thus, such a special census could not be used to determine the population of the city for the purposes of the "Group B" distribution.
A review of the relevant statutes and charter provisions indicates that no authority exists for the taking of a census of an entire county except under the decennial census. The language of the statute authorizing the use of the "latest census" merely provides that if, at a future date, such census authority should come into being, it could be given effect without amending Section66.620. Section 66.620 creates no census authority in itself.
The population of a city, town or village is itself important only in the computation of the distributions of the sales tax to the various cities and unincorporated areas in Group B. The Group B distribution is based upon population ratios alone, and not on physical boundaries. Changes in boundaries can be verified with no difficulty, but changes in population can be verified only by a census which determines the population of the entire county and all its political subdivisions.
For the foregoing reasons, it is the opinion of this office that the population of the various entities in "Group B" shall be determined once every ten years by the Federal decennial census, unless the legislature creates some other census authority which would determine the population of the entire county and its political subdivisions. However, if the Federal Bureau of Census in Washington, D.C. is able to determine the population of the annexed area from the last decennial census, then, under the rationale of Attorney General's Opinion No. 407 (1964), copy attached, the population of the annexed area, as of the last decennial census, would be included in determining the distribution to the Group B city involved.
Very truly yours,
 JOHN ASHCROFT Attorney General
Enclosure: Op. Ltr. No. 407 12/10/64, Yocum